**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Criminal No. 12-00126 (JDB)** |
| | : | |
| **v.** | : | |
| | : | **The Honorable John D. Bates** |
| **ANTHONY JAMES,** | : | |
| | : | |
| **Defendant.** | : | **Motions Hearing:  July 27, 2012** |

**GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANTS' LEGAL MOTIONS**

**RONALD C. MACHEN Jr.**
**United States Attorney**

**TODD GEE**
**Assistant United States Attorney**

## <u>TABLE OF CONTENTS</u>

I.    **FACTUAL OVERVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

II.   **MOTION TO SUPPRESS EVIDENCE.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

III.  **MOTION TO SUPPRESS STATEMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

IV.   **EXHIBITS**

## GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANT'S MOTIONS

Pursuant to the arguments set forth in the following omnibus response, and any other arguments which may be made at the hearing on the matter, the United States of America, by and through its attorney, the United States Attorney of the District of Columbia, opposes the following pretrial motions filed by defendant in this case, specifically: (1) motion to suppress evidence obtained from the search warrant; and (2) motion to suppress statements.

## I.   FACTUAL OVERVIEW

On May 2, 2012, Officer Wayne Humberson of the United States Park Police presented a sworn affidavit in support of an application for a search warrant for 1100 21st Place, N.E., Apartment 3, Washington, D.C., to a judge of the Superior Court for the District of Columbia.  On that same date, the judge signed the search warrant.[1]  The sworn affidavit alleges that within the last 72 hours, a confidential informant("CI-1"), after being searched by Off. Humberson and found free of monies and controlled substances, was provided with pre-recorded funds and then escorted to the door of 1110 21st Place, N.E.  CI-1 entered the building.  CI-1 was later observed exiting the building, and then returned to Off. Humberson.  CI-1 surrendered a quantity of white rock-like material to Off. Humberson, which field-tested as positive for cocaine base.  CI-1 explained to Off. Humberson that IT had approached apartment #3, made contact with a subject within the apartment, and exchanged the pre-recorded funds for the crack cocaine.  CI-1 was again searched and found free of monies and controlled substances.

On May 7, 2012 at approximately, 6:40 a.m., law enforcement officers executed the search warrant at 1100 21st Place, N.E., Apartment #3.  Det. Sgt. Robert Steinheimer knocked on the door

---

[1]        The warrant and affidavit are attached as Exhibit #1.

and announced, "Police with a warrant" three times, waited a reasonable time, and then ordered the Park Police SWAT team to make a forced entry into the residence.  The SWAT team then breached the door and officers entered.  The apartment was found to be a two bedroom apartment with a living room/dining room area and a kitchen.  Defendant was located in the living room/dining room area. Defendant's son was located in his bedroom.  There were no other persons found in the apartment. Defendant and his son were brought into the living room area while the search was conducted.

During the search, officers located and seized the following items of evidence from the following locations:

- 1 clear baggie from a kitchen shelf with a topknot containing 20 small clear ziplocks and 1 medium clear ziplock containing a white rock-like substance.[2]
- 1 clear baggie containing a white rock-like substance on a shelf in the dining room area.[2]
- 1 ballistic vest (i.e. body armor) from the hall closet.
- 1 dark colored plastic bag containing numerous empty ziplock bags from a kitchen drawer.
- 2 black digital scales from  kitchen drawers.
- 1 cell phone from a kitchen drawer.
- 1 Dr. Pepper can with a false bottom from a kitchen shelf.
- 1 pair of brass knuckles from a bedroom dresser.
- 2 cell phones from a bedroom dresser.
- 2 cell phones from the living room area.
- $322 from defendant's person.
- Assorted documents from the kitchen area.

After being brought to the living room area once the police entered the home and began the search, defendant was asked basic questions, such as his name, date of birth, social security number, residence, whether he was the lessee (which he said he was) and where he slept within the

---

[2]      The Drug Enforcement Agency ("DEA") later conducted an analysis of this substance and confirmed it contained cocaine base and had a net weight of 4.9 grams.

[2]      The DEA later conducted an analysis of this substance and confirmed it contained cocaine base and had a net weight of 33.3 grams.

apartment.   Defendant interrupted this routine questioning and stated that everything in the apartment was his and his son did not know anything about it.

Shortly after this initial interview, Sgt. Steinheimer then took defendant into the building's hallway for a further interview.  Defendant was advised of his rights.   In response to the question of whether he wished to answer any questions, defendant said "no."  Sgt. Steinheimer then ended the interview and brought defendant back into the apartment's living room.

The officers then continued the search.  Later, while the officers were still searching the apartment, defendant informed an officer – without any further questioning – that he wanted to talk to the detective he had spoken to previously.  Sgt. Steinheimer then returned to the living room and defendant again told him that his son did not know anything about what was in the apartment, and that he wanted to talk about what was found and to whom it belonged.

Sgt. Steinheimer then advised defendant of his rights again.  Defendant waived his rights and completed a written waiver card, which is attached as Exhibit #2.  Defendant was then asked what contraband was found in the apartment that belonged to him and where it was located.  The defendant gave a description of some of the various drugs, paraphernalia, and other items found in the home and admitted ownership of them.[3]

Defendant was arrested as a result of the search warrant's execution.  He was originally presented in District of Columbia Superior Court on May 8, 2012 on a charge of Unlawful Possession With Intent to Distribute Crack Cocaine, in violation of Title 48 of District of Columbia Code, Section 904.01(a)(1).   Defendant's Superior Court case, which was docket number

---

[3]       Defendant also consented to the search of his green BMW SUV X-5 parked nearby.  He signed a written "Consent to Search" form.  Officers then searched the vehicle, but did not recover any contraband in it.

2012CF2007876, was dismissed after he was charged in United States District Court for the District of Columbia in the above-captioned case. On or about May 11, 2011, defendant was indicted by the Grand Jury on one count of Unlawful Possession with Intent to Distribute 28 Grams or More of Cocaine Base, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(iii). A detention hearing was held before United States Magistrate Judge Alan Kay on May 17, 2012, and defendant was ordered detained pending trial.

## II.   MOTION TO SUPPRESS EVIDENCE OBTAINED FROM SEARCH

Defendant filed a motion to suppress all items seized by law enforcement officers from 1100 21st Place, N.E., Apartment 3, pursuant to the warrant executed on May 7, 2012 [Docket # 9]. This motion is without merit under the law and should be denied. There was probable cause to support the issuance of the warrant, and even if there was not, the searching agents relied in good faith on the judge's determination that probable cause existed. Accordingly, defendant's motion is meritless and should be denied.

### A.   The Evidence Should Not Be Suppressed Because the Exclusionary Rule Does Not Apply to Evidence Seized Pursuant to a Lawfully Executed Search Warrant

Defendant challenges the sufficiency of the probable cause determination rendered by the reviewing judge, and argues for suppression of evidence obtained pursuant to the lawful execution of that search warrant. In light of the "good faith" exception discussed below, the suppression issue can be resolved without necessity for any testimony beyond identifying the warrant, its accompanying affidavit, the judge's signature to the warrant, and that officers executing the warrant relied upon the validity of the warrant when they executed it.

1.    **Legal Principles**

For at least the past twenty years, the law has not supported application of the exclusionary rule in the manner defendant now advocates.  In a landmark decision, United States v. Leon, 468 U.S. 897 (1984), the Supreme Court created the "good faith" exception to the exclusionary rule.  In short, the Supreme Court concluded that suppression of evidence obtained by execution of a lawfully obtained search warrant would not serve any useful purpose to deter police misconduct.  Id. 918-19. Consequently, it is unnecessary for any reviewing court to revisit the probable cause determination made by another judge or magistrate once it is established that the officer executed the search warrant in a good faith reliance upon its validity.   See, e.g., United States v. Garey, 329 F.3d 573, 577 (7th Cir. 2003); United States v. Price, 265 F.3d 1097, 1102, (10th Cir. 2001).

It is a well-grounded principle of law that even if the affidavit failed to establish probable cause, suppression of the evidence would not be an appropriate remedy if the officers conducting the search acted in "objectively reasonable reliance" on the warrant's validity.  Leon, 468 U.S. at 922.  Ordinarily, the existence of a warrant is sufficient to establish that the officers acted in good faith in conducting the search.  Id. (quoting United States v. Ross. 456 U.S. 798, 823 n.32 (1982)). Suppression in such a case would be appropriate only if the defense were to demonstrate that the affidavit was "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"  Leon, 468 U.S. at 923 (quoting Brown v. Illinois, 422 U.S. 590, 610 (1975) (Powell, J. concurring in part)).[4]

---

[4]    The Supreme Court established three other grounds that would invalidate operation of the good faith exception to the exclusionary rule.  The exception would not apply if the "magistrate abandoned his detached and neutral role" in assessing the affidavit or if the "officers were dishonest or reckless in preparing their affidavit," or if the warrant was so facially deficient (e.g., warrant fails to identify the premises to be searched) that a reasonable officer could not have believed that it was valid.  Leon, 468 U.S. at 923.  No such allegations can be

## 2. <u>Analysis</u>

Here, defendant maintains that "the affidavit in this case is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" (Defendant's Motion at 6 (internal quotation marks omitted)).  Defendant adds that, "Probable cause to believe that drugs were in that apartment is so lacking as to negate any assertion that it was acted upon in good faith.  Therefore, all of the evidence seized as a result of this illegal search must be suppressed."  (Id.)

Defendant's broadly written complaint fails to meet the high standard set in <u>Leon</u> for rejecting the "good faith" exception if the defense were to demonstrate that the affidavit was "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"  <u>Leon</u>, 468 U.S. at 923 (quoting <u>Brown</u>, 422 U.S. at 610 (Powell, J. concurring in part)).  Even if the warrant here did actually lack in probable cause, the description contained in the affidavit of the drug transaction between CI-1 and a subject in the apartment, the background of CI-1 described in the affidavit, and the description of Off. Humberson's management of CI-1 were together sufficient for an officer to believe that the existence of the warrant was not entirely unreasonable.  As in this case, there are numerous cases in which reviewing appellate courts expressed concern about possible infirmities effecting probable cause articulated in affidavits, yet appropriately applied the <u>Leon</u> good faith exception to the exclusionary rule.  <u>See</u>, e.g., <u>United States v. Webb</u>, 255 F.3d 890, 904-05 (D.C. Cir. 2001) (holding that even assuming the government's affidavit was insufficient to establish probable cause, motion to suppress should be denied due to the <u>Leon</u> good faith exception).  <u>See.</u>, <u>e.g.</u>, <u>United States v. Schulz</u>, 14 F.3d 1093 (6th Cir. 1994)

---

supported in this case.

(while warrant for safe deposit box was based on a "hunch," court could not conclude the warrant was "so lacking" in the indicia of probable cause as to render official belief in its existence entirely unreasonable); United States v. Nolan, 199 F. 3d 1180 (10th Cir. 1999) (recognizing its contradiction with other circuits that have held that in cases involving drug trafficking, observations of illegal activity outside can provide probable cause for search inside the home, but nonetheless the court decided case relying on good faith exception to the exclusionary rule).

## B.    The Warrant Did Not Lack Probable Cause

Ultimately, a review of the entire affidavit demonstrates that the facts therein were more than adequate to demonstrate probable cause to search the residence.  Although the good faith exception to the exclusionary rule articulated in Leon makes it unnecessary for the Court to resolve defendant's challenge to the probable cause articulated and already found in the search warrant affidavit, the Court's examination of the affidavit will result in the conclusion that probable cause was demonstrated and the challenge is devoid of merit.

### 1.    Legal Principles

The Supreme Court has expressed the standard for review of a magistrate's finding of probable cause as follows:

> When assessing probable cause for a warrant, [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed.

Illinois v. Gates, 462 U.S. 213, 238-39 (1983) (internal quotations omitted).

The issuing court's determination of probable cause "should be paid great deference by reviewing courts." Gates, 462 U.S. at 236 (citation omitted).  Moreover, the reviewing court should

recognize that affidavits for search warrants "must be tested and interpreted by magistrates and courts in a common sense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleading have no proper place in this area." United States v. Ventresca, 380 U.S. 102, 108 (1965). The "reviewing court will not make a de novo determination of probable cause, but will uphold the decision to issue the warrant if it is supported by substantial evidence." United States v. Thomas, 989 F.2d 1252, 1254 (D.C. Cir. 1993) (citing Massachusetts v. Upton, 466 U.S. 727, 728 (1984)).

## 2.    **Analysis**

Defendant's motion alleges that the affidavit in this case fails to establish probable cause because it "does not establish the reliability of the informant," it does not "suggest that the informant observed any other indicia of drug activity or a description of the individual who allegedly possessed the crack cocaine, or a nexus of that individual to the apartment," and it does not "indicate that the person who possessed the crack cocaine was anything more than a casual visitor or temporary user of the apartment." (Defendant's Motion at 3-4).

As an initial matter, the warrant sufficiently demonstrates the reliability of the informant through its sworn declaration that Off. Humberson maintains a "series of checks and balances in order t[o] maintain the reliability and veracity of each respective source," CI-1 is a "confidential reliable source," ITS information "has led to the seizure of controlled substances, monies, firearms and the arrests of subjects," and IT "has never been known to provide police with false or unreliable information." See, e.g., United States v. Warren, 42 F.3d 647, 650, 652 (D.C. Cir. 1994) (finding probable cause to support the warrant, where among other things, the affidavit stated that the

informant had "proven reliable in the past," had provided information that "resulted in the seizure of large quantities of cocaine, about 8 guns and about 52 defendants," and had "never been proven unreliable.").

Through the information provided by the reliable informant, the warrant establishes probable cause to believe that narcotics trafficking was occurring at the apartment. The warrant specifically states that "withing the last seven days, [Off. Humberson] spoke with a CI-1 in reference to narcotics activity at the address of 1100 21st Place, apartment #3, Northeast Washington, D.C.," and then describes how "within the past seventy-two hours" the controlled buy was made by CI-1 from that address. The precedents of the United States Court of Appeals for the District of Columbia Circuit "consistently have recognized that police establish probable cause for a search where they corroborate a reliable informant's tip about drug activity at a residence by conducting a single controlled buy of illegal narcotics." Warren, 42 F.3d at 652 (citing United States v. Allen, 960 F.2d 1055, 1057 (D.C. Cir.), cert. denied, 506 U.S. 881 (1992); United States v. Branch, 545 F.2d 177, 179-80 (D.C. Cir. 1976)). Moreover, defendant's complaint that the warrant is insufficient because it establishes no connection between the person who sold to CI-1 and the apartment is of no consequence under the law. See, e.g, United States v. Allen, 960 F.2d 1055, 1057 (D.C. Cir. 1992) (Informant's single purchase of small rock of crack from unknown individual in hallway of house constituted probable cause for issuance of search warrant for house). Therefore, when the totality of the circumstances are considered, the warrant establishes probable cause.

C.    **The Actions of the Officers in the Case Did Not Violate Rule 41(d) of the Federal Rules of Criminal Procedure or Rule 41(e)(4) of the Superior Court Rules of Criminal Procedure**

Defendant maintains that the evidence seized in the search warrant should be excluded

because, in his view, the warrant was executed in violation of the provisions in Rule 41(d) of the Federal Rules of Criminal Procedure and Rule 41(e)(4) of the Superior Court Rules of Criminal Procedure for posting warrants and/or providing them to the person from whose premises the property was taken.  Regardless of which of these rules are applied here, defendant's arguments are without merit as the return on the cover page of the warrant, which was sworn to by Sgt. Steinheimer, clearly states, "I left a copy of the warrant and return with Anthony James properly posted."

## III.   DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

Defendant filed a motion to suppress statements claiming that the statements he gave to law enforcement on May 7, 2012 were made involuntarily and in violation of his <u>Miranda</u> rights [Docket # 10].  Defendant fails to present <u>any</u> facts, as none exist, to support his contention that his statements were given involuntarily or in violation of his <u>Miranda</u> rights.  Accordingly, his motion should be denied.

### A.   Defendant's Statements Were Not Given Involuntarily

Defendant maintains that his statements were elicited involuntarily in violation of the Fifth Amendment (Defendant's Motion at 2-3).  Defendant provides no facts in support of this claim. Because under the totality of the circumstances the officers did not do anything to overbear defendant's will, his claims should be rejected without merit.

#### 1.   Legal Principles

A confession must be made voluntarily in order to comport with due process of law.  <u>See,</u>

e.g., United States v. Bradshaw, 935 F.2d 295, 299 (D.C. Cir. 1991).  The Supreme Court has indicated that voluntariness should be determined with reference to the totality of the circumstances, and that the ultimate question is whether the suspect's "will [has been] overborne" by "coercive police activity."  Colorado v. Connelly, 479 U.S. 157, 167, 178 n.2 (1986); Culombe v. Connecticut, 367 U.S. 568, 602 (1961) (Frankfurter, J.).  "Voluntariness" is determined by examining the totality of all the surrounding circumstances in which the statement was made, including the characteristics of the suspect and the details of the interrogation.  Schneckloth v. Bustamonte, 412 U.S. 218, 225-226 (1973) (confession involuntary if defendant's "will has been overborne and his capacity for self-determination critically impaired").  Id. at 225-226.

## 2. Analysis

Defendant asserts that his statements were made involuntarily, yet provides no explanation of the manner in which his will was overborne.  Defendant does not allege claims that would merit a finding of a lack of voluntariness, such as that he was physically abused.  See, e.g., Brown v. Mississippi, 297 U.S. 278 (1936) (torture).  Simply put, there is no evidence defendant has or can offer that would demonstrate a lack of voluntariness by constitutional standards.

**B.    Defendant's Statements Were Not Given in Violation of <u>Miranda</u> Because He Was Not in Custody, Some Statements Were in Response to Routine Questions, Some Statements Were Spontaneous, and His Other Statements Were Made After He Reinitiated Questioning and Made a Valid Waiver**

Defendant maintains that all of the statements he made during the execution of the search warrant were in violation of his Miranda rights.  Defendant does not divide the statements he made into categories when analyzing why they are inadmissible, but instead simply states that he was in custody when he made the statements, was not adequately apprised of his rights, and did not make

a valid waiver (Defendant's Motion at 4).  Defendant's claims are without merit because he was not

in custody or interrogated, so Miranda does not apply.  Additionally, even if he was in custody and

subject to interrogation, when defendant's statements are categorized according to the circumstances

in which they were made, each of them are admissible because they were either made in response

to routine questions, spontaneously, or after the defendant reinitiated questioning and made a valid

waiver of his Miranda rights.

### 1.    Legal Principles

Miranda and its progeny established a set of prophylactic rules, based on the Constitution,

to ensure that suspects' Fifth Amendment rights are protected.  See, e.g., Dickerson v. United States,

530 U.S. 428, 437 (2000); Oregon v. Elstad, 470 U.S. 298, 306-307 (1985).  Essentially, Miranda

requires that suspects in police custody be given warnings about their rights before they are

subjected to interrogation, and that any statement made by such suspects be the product of a

knowing, intelligent, and voluntary waiver of rights.  See Elstad, 470 U.S. at 306.  The government

bears the burden of proof by preponderance on the question whether there was a knowing,

intelligent, and voluntary waiver.  Connelly, 479 U.S. at 167-169.

The safeguards articulated in Miranda are not triggered until a person is subject to a

"custodial interrogation."  See  California v. Beheler, 463 U.S. 1121, 1123 (1983).  A custodial

interrogation occurs when "questioning [is] initiated by law enforcement officers after a person has

been taken into custody or otherwise deprived of his freedom of action in a significant way."

Miranda, 348 U.S. at 444.  Furthermore, when an individual is detained for a temporary and

reasonable amount of time under Terry v. Ohio, 391 U.S. 1 (1968), Miranda warnings are not

usually required.  Berkemer v. McCarty, 468 U.S. 420, 439-40 (1984).  If the questioning exceeds

beyond a <u>Terry</u>-type inquiry and the individual is "in custody" for practical purposes, the individual must receive his <u>Miranda</u> warnings. <u>Id.</u>  In order to determine whether or not an individual has been taken into custody, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." <u>Beheler</u>, 436 U.S. at 1125 (quoting <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495); <u>see</u> <u>Berkemer</u>, 468 U.S. at 441- 442 (noting that <u>Miranda</u> is required when the court finds that a reasonable person in the suspect's situation could believe he was in police custody to the degree associated with a formal arrest).

### 2. Defendant Was Not in Custody or Being Interrogated for Miranda Purposes During the Initial Questioning

Defendant was not in custodial interrogation for <u>Miranda</u> purposes during the execution of the search warrant when he was in the living room and initially asked the routine questions about his residence, birth date, etc.  Instead, defendant was merely detained, similar to a detention during a <u>Terry</u> stop.  <u>See</u> <u>Michigan v. Summers</u>, 452 U.S. 692, 702 (1981) (holding that a detention of a person during the execution of a search warrant of his residence is lawful under the Fourth Amendment because it is "substantially less intrusive than an arrest" (citation omitted)); <u>United States v. Burns</u>, 37 F.3d 276 (7th Cir. 1994) ("While detention during the execution of a search warrant is not a traditional <u>Terry</u> stop, it is sufficiently analogous for us to conclude that, in the usual case, <u>Miranda</u> warnings are not required." (internal footnote omitted)).  Defendant's temporary detention did not convert into custody for Fifth Amendment purposes until the crack cocaine was discovered in his house and he was placed under arrest.

In <u>United States v. Callaway</u>, 298 F.Supp.2d 39 (D.D.C. 2003), Judge Leon held that a defendant was not in custody for the purposes of <u>Miranda</u> when five police officers executed a

search warrant and asked him whether there was anything they should know about before they "tear [his] grandmother's house apart." Id. at 47.   The court found that since the detention was not prolonged, the officers only briefly brandished their weapons to secure the space, and the defendant was not "treated any differently than any other person who is secured . . . during the execution of a search warrant," the individual was not in custody.  Id. at 49.

Similarly, in United States v. Haque, 315 Fed.Appx. 510 (6th Cir. 2009), an individual was briefly questioned during the execution of a search warrant by twelve FBI agents. Id. at 519.   The agents entered the residence wearing raid jackets and bulletproof vests and had their weapons drawn until the house was secured.  Id. at 519.   The Sixth Circuit held that the statements made by the defendant after an agent asked him if "they could talk" were not made during custody.  Id. (noting that during this time, the two were sitting near the entrance to the residence, the defendant was not handcuffed, he was free to move, and the conversation was not recorded); see also United States v. Davis, 530 F.3d 1069, 1081-1082 (9th Cir. 2008) ("Where an individual has been detained incident to a search warrant, and officers' questioning stays within bounds of questioning permitted during a Terry stop, Miranda rights are not required."); Burns, 37 F.3d at 281 (holding that the defendant was not in custody for the purposes of Miranda when two officers asked the defendant questions while executing a search warrant); United States v. Saadeh, 61 F.3d 510, 520 (7th Cir. 1995) ("A person detained during the execution of a search warrant is normally not in custody for Miranda purposes.").

In this case, defendant's brief detention during the execution of the search warrant did not elevate to custody.   The detective questioning him did not brandish any weapons.   Furthermore, he did not speak with defendant in an intimidating or coercive manner.  See Sprosty v. Buchler, 79 F.3d

16

635, 641 (7th Cir. 1996) (circumstances like the coercive or accusatory nature of the questioning is relevant for the existence of custody).  Also, even if defendant was in handcuffs during the conversation,[5] handcuffs do not automatically covert a detention under Terry into custody. See e.g., United States v. Purry, 545 F.2d 217, 220 (D.C.Cir. 1976) (Handcuffing a suspect does not necessarily dictate a finding of custody); United States v. Leshuk, 65 F.3d 1105, 1109-10 (4th Cir. 1995); United States v. Bautista, 684 F.2d 1286, 1292 (9th cir. 1982) ("Strong but reasonable measures to insure the safety of the officers or the public can be taken without necessarily compelling a finding that the suspect was in custody") (internal citations omitted). [6]

In addition, the detective's questioning did not elevate the detention to custody since it was reasonable.  See Berkemer, 468 U.S. at 439 ("The stop and inquiry must be reasonably related in scope to the justification for their initiation.").  The scope of the questions were limited to securing the residence, and were reasonable, given the safety concerns of the officers executing the search warrant for drugs.  See United States v. Payne, 805 F.2d 1062, 1065 (D.C. Cir. 1986) ("[I]t is uniformly been recognized that substantial dealers in narcotics possess firearms . . . ."); see also Callaway, 298 F.Supp. 2d at 49 (noting that when the officers questioning is limited and not "specifically focused on either the possessions, or prior conduct by the defendant" it is inconsistent

---

[5]      At the time this pleading was being prepared, government counsel was unable to reach Sgt. Steinheimer to inquire whether defendant was in handcuffs at any point when he was being questioned.

[6]      Even when a court has taken a different position on the issue of whether a handcuffed individual is in custody for Fifth Amendment purposes when a search warrant is being executed, it has found that such questioning by a law enforcement agent is appropriate pursuant to Miranda's public safety exception.  United States v. Newton, 369 F.3d 659, 673 (2d Cir. 2004).  Several courts have distinguished Newton.  See, e.g., United States v. Couch, 2005 WL 2250848 at * 2-3 (N.D.N.Y. Sep. 14, 2005) (Newton involved parole officer searching parolee's apartment after receiving complaints that parolee had handgun).

"with the type of police conduct that is the functional equivalent of an arrest.").

Additionally, the questions defendant was asked initially were not "interrogation" for the purposes of <u>Miranda</u>, where the term means "words or actions . . . that the police should know are reasonably likely to elicit an incriminating response from the subject." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980). Routine administrative questions do not rise to the level of interrogation under this test. <u>See</u> <u>United States v. Gaston</u>, 357 F.3d 77, 82 (D.C. Cir.) (during execution of search warrant, questions about ownership of house and identity and addresses of persons present during execution of warrant, who were handcuffed, were "reasonably related to the police's administrative concerns," because police had to give a copy of the warrant and receipt for the property to the person from whose premises the property was taken; therefore such questions did not constitute interrogation), <u>cert. denied</u>, 541 U.S. 1091 (2004).[7]

### 3.   Defendant's Initial Admission Was Spontaneous

During the initial routine questioning, defendant interrupted Sgt. Steinheimer and spontaneously stated that everything in the apartment was his and his son did not know anything about it. Such voluntary, spontaneous statements, whether before or after arrest, or reading of <u>Miranda</u> rights, are free from constitutional objection. <u>Miranda</u>, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding here today."); <u>United States Samuels</u>, 938 F.2d 210, 214 (D.C. Cir. 1991) ("[S]pontaneous statements are admissible without <u>Miranda</u> warnings.") (citations omitted).

---

[7]    Even if defendant was actually under arrest at the time these routine questions were asked, they are admissible as booking questions. Like other police activities "normally attendant upon arrest and custody," standard booking questions are not generally viewed as interrogation. <u>See</u>, <u>e.g.</u>, <u>Pennsylvania v. Muniz</u>, 496 U.S. 582 (1990) (plurality); <u>United States v. Walls</u>, 70 F.3d 1323 (D.C. Cir. 1995).

**4.      Defendant Reinitiated Questioning, Made More Spontaneous Statements, and then Made a Valid Waiver**

After defendant made the initial spontaneous admission discussed above, he was taken to the hallway where Sgt. Steinheimer explained his rights to him.  Defendant replied in the negative when asked if he wanted to answer any questions, and then the questioning was stopped and he was taken back to the living room.  Defendant then later, of his own volition, told an officer that he wanted to talk again with the detective.  Defendant then made yet another spontaneous statement when Sgt. Steinheimer returned, was read his rights, waived them on a written card (Exhibit 2), and then made more inculpatory statements.  Such a sequence of events is in no way a violation of defendant's Miranda rights when each of these statements are analyzed in turn.

As an initial matter, defendant's second series of spontaneous statements, that his son did not know anything about what was in the apartment and that he wanted to talk about what was found and to whom it belonged, made when Sgt. Steinheimer returned to the room after being told defendant wanted to speak to him again, is admissible as a spontaneous statement, regardless of Miranda, for the same reasons discussed above.  Miranda, 384 U.S. at 478; Samuels, 938 F.2d at 214.

Defendants statements made next after Sgt. Steinheimer read him his rights again and he waived are also admissible. The government concedes defendant made a valid invocation of his Miranda rights in the hallway.  If a suspect invokes the right to silence in such a manner, the police must "scrupulously honor" that invocation.  Michigan v. Mosley, 423 U.S. 96, 104 (1975) (quoting Miranda, 384 U.S. at 479).  Here, defendant's invocation of the right to silence was honored when Sgt. Steinheimer stopped questioning and returned him to the living room after he initially said he

19

did not want to answer any questions.  Such an invocation of a <u>Miranda</u> right, however, does not mean police can never question a suspect again under any circumstances.  <u>See</u> <u>id</u>.  Where an unprompted defendant reinitiates questioning, for example, as defendant did here by telling the officer he wanted to talk to the detective again, police may begin questioning again without violating <u>Miranda</u>.  <u>See</u> <u>Oregon v. Bradshaw</u>, 462 U.S. 1039, 1043-44 (1983) (plurality) (permissible to begin questioning again after defendant invoked right to counsel and then reinitiated questioning); <u>United States v. Straker</u>, 596 F. Supp. 2d 80, 92 (D.D.C. 2009) ("[E]ven after a defendant invokes the right to counsel, the police may resume interrogation where 'the accused himself initiates further communication, exchanges, or conversations with the police.'") (quoting <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981)).

"An 'initiation' sufficient to authorize renewed police questioning occurs when the defendant 'evince[s] a willingness and a desire for a generalized discussion about the investigation,' and also knowingly and intelligently waives his right to counsel based on a consideration of the totality of the circumstances."  <u>Straker</u>, 596 F. Supp. 2d at 92 (quoting <u>Oregon v. Bradshaw</u>, 462 U.S. at 1045–46; <u>United States v. Ware</u>, 338 F.3d 476, 481 (6th Cir. 2003)).  Here defendant clearly indicated his willingness to have a discussion about the search being conducted around him, and that he understood his rights after having them explained to him a second time and after executing a written rights waiver card.

Defendant's answers to this second explanation of his rights, and his written completion of the waiver card (Exhibit 2) indicating he understood his rights and wished to answer questions at that time without counsel present, also demonstrated a valid waiver under <u>Miranda</u>.  A defendant's maturity, education, and experience with the police can indicate the ability of the suspect to

understand a waiver of <u>Miranda</u> rights.  <u>United States v. Robinson</u>, 698 F.2d 448, 455 (D.C. Cir. 1983); <u>see</u> <u>also United States v. Dorsey</u>, 591 F.2d 922, 932-33 (D.C. Cir. 1978) (finding defendant's high school education and period of service in the Navy suggested a valid waiver); <u>Pettyjohn v. United States</u>, 419 F.2d 651, 654 n.7 (D.C. Cir. 1969) ("[T]he validity of any Miranda waiver must be determined by the court's inspection of the particular circumstances involved, including the education, experience, and conduct of the accused.").  In <u>Robinson</u>, a statement was judged voluntary in light of the defendant's age (thirty years old), possession off an eleventh-grade education, and his having been convicted twice before of serious felonies.  <u>Robinson</u>, 698 F.2d at 455.  Here, defendant is a middle-aged man with numerous prior arrests and convictions.  He reported he to the Pretrial Services Agency that he has received his General Equivalency Diploma ("GED").  Defendant has not alleged any evidence of serious mental deficiencies or other circumstances that could rise to a level to demonstrate that he did not understand what was happening.  Therefore, defendant's statements made to Sgt. Steinheimer after he completed the rights card were made after a knowing, intelligent, and voluntary waiver of <u>Miranda</u> rights and thus should be admitted at trial.[8]

---

[8]    Defendant briefly argues that "any evidence seized as a result of [his] statements must be suppressed as well" (Defendant's Motion at 4).  Even if one assumes that defendant was in custody and Sgt. Steinheimer's questions at any point somehow violated his Fifth Amendment rights (which, as discussed above, is not the case),  the drugs and other evidence recovered from defendant's house would not be subject to suppression.  The inevitable-discovery doctrine permits a court to consider what would have happened if defendant had refused to answer the questions or if Sgt. Steinheimer had made no inquiry at all.  Regardless of whether defendant specified the location of the crack cocaine and some of the other evidence in his house in his final round of questions with Sgt. Steinheimer, the officers would still have searched defendant's house and located that contraband because it was in readily observable locations, such as kitchen and dining room shelves and drawers.  No speculation is required to reach this conclusion.  Thus, the inevitability of the discovery of the drugs, regardless of whether defendant answered the questions posed to him, is clearly established.  "[W]hen, as here, the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no

## CONCLUSION

Wherefore, for all of the reasons submitted above, the government requests that defendant's motions be denied.

Respectfully submitted,

RONALD C. MACHEN JR.

UNITED STATES ATTORNEY

DC Bar No. 447889

By:            /s/

Todd Gee

Assistant United States Attorney

D.C. Bar No. 495,001.

555 Fourth Street, N.W., Room 9844

Washington, DC 20530

(202) 252-7224

---

nexus sufficient to provide a taint and the evidence is admissible."  Nix v. Williams, 467 U.S. 431, 448 (1984) (adopting inevitable-discovery exception to the exclusionary rule for violation of Sixth Amendment right to counsel); United States v. Gale, 952 F.2d 1412, 1416-17 (D.C. Cir. 1992) (applying inevitable-discovery doctrine to allow admission of evidence despite Miranda violation).