**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Criminal Action No. 12-126 (JEB)** |
| **ANTHONY MARCELLUS JAMES,** | |
| **Defendant.** | |

## MEMORANDUM OPINION

In 2013, Defendant Anthony James was tried and convicted of possession with intent to distribute 28 grams or more of cocaine base. He represented himself at trial, although attorney Edward Sussman assisted in certain respects as standby counsel. On appeal, James argued that Sussman was constitutionally ineffective, principally because he had subpoenaed several witnesses for the wrong date, rendering them unable to testify at trial. Declining for the time being to decide whether a *pro se* defendant even has a constitutional right to effective standby counsel, the Court of Appeals remanded the claim to this Court to "determine whether standby counsel's performance was deficient and prejudicial." United States v. James, 719 F. App'x 17, 18 (D.C. Cir. 2018). With the benefit of an evidentiary hearing and further briefing, the Court now rejects Defendant's claim because any ineffectiveness did not prejudice his case.

## I.       Background

The Court explains in some detail the three stages of legal proceedings: first, Defendant's trial and conviction; second, his appeal; and last, the remand proceedings before this Court.

### A.    Trial

James was charged with possession with intent to distribute 28 grams or more of cocaine base, which was recovered in a search warrant executed in May 2012 on his apartment at 1100

1

21st Place, NE, in Washington.  The centerpiece of his current claim — as in many ineffective-assistance-of-counsel situations — is what transpired at trial.  The Court will, accordingly, give a somewhat lengthy account of the proceedings there.

James's case was originally assigned to Judge John D. Bates, who presided over most of the pre-trial proceedings.  For the first several months after his arrest, Defendant was represented by David Bos of the Federal Public Defender's Office.  Bos withdrew after James grew dissatisfied with his representation and was replaced by attorney Edward Sussman.  See ECF Nos. 14, 16.  The relationship with Sussman, however, fared little better.  Defendant thus indicated to the court on May 2, 2013, that he wished to proceed *pro se* and forgo Sussman's — or any other attorney's — representation.  See ECF No. 151 (Tr. Status Hearing 5/2/13) at 3–5.  At a hearing, Judge Bates engaged in an extended colloquy with James to insure that he understood the risks of that decision.  Id.  Satisfied that Defendant had "articulately and unmistakably asserted his rights under Faretta v. California, 422 U.S. 806 (1975)," and that he "[wa]s aware of the seriousness of the charges against him and [wa]s cognizant that proceeding without the assistance of a trained lawyer constitutes a distinct handicap," the court found that the waiver of Defendant's right to counsel was "voluntary, knowing, and intelligent."  See ECF No. 43 (Order on *Pro Se* Representation).  It thus allowed James to represent himself.

At the same time, the court directed Sussman to remain in the case, but now as standby counsel.  Id.  Sussman's role, Judge Bates explained, would be to give Defendant "advice and some assistance in the courtroom and outside of the courtroom."  Tr. Status Hearing 5/2/13 at 13.  James, however, would "be in charge" and responsible for "making the decisions."  Id. at 22.  During the same hearing, Defendant also inquired into whether he could have assistance investigating the case and gathering witnesses — efforts that Sussman had been spearheading.

Id. at 6, 22.  Judge Bates explained that he could have the assistance of the same investigator who had been working with Sussman so far, but what investigation should be pursued would be James's "decision," within reasonable bounds.  Id.

Several weeks before trial, the case was reassigned to Judge Robert L. Wilkins.  With James continuing to represent himself, trial began on July 10, 2013.  Proceeding over three days, the Government offered the following evidence in its case-in-chief.  The U.S. Park Police executed a warrant at the apartment Defendant shared with his adult son, Anthony Dunn; the two, who were the sole residents and leaseholders, were also the only ones present that day.  After entering the apartment, the officers handcuffed both men and placed them on a couch in the living room.  See ECF No. 99 (Tr. Day 2) at 256–57, 261.  While an officer was asking Dunn for basic identifying information, "Mr. James interrupted and stated, 'My son doesn't know anything about this.  I'm taking all of this.'"  Id. at 265.  When Defendant made that statement, the officers had not yet found any contraband in the apartment.  Id. at 266.  A detective advised James of his Miranda rights, and he declined at that point to answer further questions.  Id. at 267.

In the subsequent search, the police found in the kitchen and dining area 4.9 grams of cocaine base packaged in small plastic bags and 33.3 grams of cocaine base in one larger plastic bag.  See ECF No. 100 (Tr. Day 3) at 349–55, 389.  They also discovered several hundred small unused plastic bags, two digital scales, a false-bottom Dr. Pepper can with some white residue on the interior, and a bulletproof vest.  Id. at 357–69.  During the search, James interjected again that his son did not know about anything in the apartment.  See Tr. Day 2 at 268.  Officers re-read Defendant his Miranda rights — which he now agreed to waive — and began questioning him about the contraband.  Id. at 268–72.  According to the lead detective, James made statements taking responsibility for the cocaine in the apartment and identified where and in what

amounts it would be found along with its cash value; on cross-examination, the detective admitted that James may have known that the officers had recovered narcotics before making some of these admissions.  Id. at 268–78, 295–96.  Officers also found over $300 in cash on Defendant after he was arrested.  See Tr. Day 3 at 330–31.  An expert testified that the amounts of cocaine found in the apartment and the manner in which it was packaged were indicative of a mid-level distributor.  Id. at 499–501.  Several stipulations were also presented to the jury, including one in which Defendant admitted that within 72 hours before May 1, 2012, a person purchased $20 of crack cocaine from a woman in his apartment.  See Tr. Day 2 at 284–85; ECF No. 69-3 (Stipulation).

In addition to vigorously cross-examining the Government's witnesses, Defendant put on his own case.  On July 16, the fourth day of trial, he began his defense by calling Detective Glenn Luppino, who also participated in the search of the apartment.  Under Defendant's questioning, the witness — consistent with the lead detective — agreed that James could have seen some of the contraband the police recovered from where he was seated in the living room.  See ECF No. 101 (Tr. Day 4) at 551.  Defendant then called his next-door neighbor, Angela Pearson.  She testified that James's wife had not been living at his apartment in the past several months, that James had been out of town the several days before the police raided his apartment, and that there are frequent break-ins in the neighborhood.  Id. at 564–66.  Last, Defendant gave wide-ranging testimony on his own behalf.  Among other things, he said that he was in North Carolina in the days before the police arrived, that many other people had keys to his apartment — including his then-girlfriend, Porsha Foster, who stayed over five nights a week and kept personal items there — that neither he nor his son knew anything about the drugs the police had recovered, and that he only made statements to police about the cocaine to prevent his son from

being arrested.  Id. at 570–604.  After testifying, Defendant was asked by Judge Wilkins if he

had any other evidence.  James said that he did not and thus rested his case.  Id. at 618.

The same afternoon, the Government put on a brief rebuttal case.  It first called Porsha

Foster, who testified that she stayed over at James's apartment several times a week and that she

had seen him on a previous occasion within several months of his arrest bagging cocaine in his

living room.  Id. at 633–36.  The second rebuttal witness was Delonte Black, a confidential

informant for the Park Police.  Black — consistent with the stipulation previously entered into

evidence — testified that he had purchased crack cocaine from a woman in James's apartment

about a week before the search warrant was executed.  Id. at 641–66.  Upon questioning from the

Government, he identified that woman as Defendant's wife.  Id. at 666.  Black also testified that

two days before the police searched the apartment, James had given another man in the

neighborhood cocaine in exchange for washing his car.  Id. at 668–69.

With an eventful day four drawing to a close, Defendant sought to present a surrebuttal

case, seeking to call his investigator, Robert Versis, to testify to statements Porsha Foster had

made that were inconsistent with her rebuttal testimony.  Id. at 683–84.  The Court allowed the

testimony on this narrow issue.  Id. at 685–86.  Versis then averred that Foster had told him on

the phone that she had never seen Defendant sell or possess drugs.  Id. at 688.  James then rested

his surrebuttal case, and the evidence closed.  Id. at 690.

July 17, the trial's fifth day, was not without drama of its own.  As the parties were

discussing the proposed verdict form before closing arguments, James interjected to point out his

"wife, who was supposed to be here to testify for [him] yesterday, subpoena wasn't renewed

from the old one she had last week, so she wasn't aware that she was supposed to have been here

yesterday to give testimony."  See ECF No. 102 (Tr. Day 5) at 707.  Tania James, who was

present in the courtroom, handed up her subpoena to Judge Wilkins, who inquired as to why it was dated July 17, rather than July 16 or another earlier date. Id. at 708. Sussman did not know why it said that date, though he wondered aloud whether the defense case at one point had been expected to begin on the 17th. Id. at 708–09. He further explained that Versis, the defense investigator, had tried to reach Tania on the 16th but had been unable to do so, and they "just continued on." Id. at 708. James then interjected that another witness, Lynetta Church, had also received a subpoena for the 17th. Id. at 709. When the Court inquired of Defendant why he had not insured that Tania or Church was present on the 16th or asked for a bench warrant, he explained that he thought they were subpoenaed for that day and "just didn't show up." Id. at 710. And because he thought they had chosen not to show up, rather than that they had been subpoenaed for a different day, he did not ask for a bench warrant or a continuance. Id. at 710– 12. Judge Wilkins declined to interrupt proceedings for Tania or Church to testify. He explained that "[James] had an opportunity to put on [his] defense case, and [he] should have raised it then . . . and [he] didn't. [His] defense case came and went, and the government's rebuttal case came and went. Then [his] surrebuttal case came and went, and there was not a word of this." Id. at 713.

After closings, the jury began its deliberations, quickly returning a verdict that same afternoon. It found Defendant guilty on the one count charged in the indictment — possession with intent to distribute 28 grams or more of cocaine base. Id. at 806. James was ultimately sentenced to a mandatory minimum ten years' incarceration and eight years of supervised release. See ECF No. 173.

B.  Appeal

Assisted by counsel, Defendant appealed to the D.C. Circuit, arguing both that a Government witness had offered improper expert testimony and that standby counsel Sussman had performed ineffectively in violation of James's Sixth Amendment rights.  The Court rejected the first point but remanded the second so that "the district court can determine whether standby counsel's performance was deficient and prejudicial."  James, 719 F. App'x at 18.  This obviated the need to decide the constitutional question of whether "standby counsel can be the subject of a constitutional ineffective assistance claim."  Id.

C.  Remand

On remand, Judge Wilkins having since ascended to a loftier perch and after an interim stop with now-retired Judge Gladys Kessler, the case was randomly reassigned to this Court, which obtained briefing and held an evidentiary hearing.  The crux of James's claim is that his standby counsel was ineffective in subpoenaing three witnesses — Tania James, Tia Ivey (an associate of Defendant's), and Lynetta Church — for the wrong date.  See ECF No. 199 (Def. Mem.) at 4–6, 9–11.  At the remand hearing, Defendant called three people to testify — himself, Tania, and Ivey.  On his own behalf, James explained what had transpired at trial with respect to those witnesses.  According to him, when the time came for defense witnesses on July 16, Sussman had told him that "they didn't want to" testify and thus were not present.  See ECF No. 202 (Tr. Evid. Hearing) at 14.  The next day, however, after the evidence had closed, James saw Tania and Lynetta Church in the courtroom.  Id. at 14, 16.  Tania handed up her subpoena to the Court, and its date appeared to read July 17 — that same day.  Id. at 15–16.  By this point, however, Judge Wilkins had ruled that it was too late for Defendant to call any additional witnesses.  At the evidentiary hearing, James explained that Tania, if she had been able to testify,

7

would have said that she and Defendant were estranged, that she did not sell drugs from that apartment, and that neither she nor James knew Delonte Black. Id. at 11. Church and Ivey would have testified more generally that they had not seen James sell drugs within a few months of his arrest. Id. at 12–13. Defendant also testified at the hearing that he had trusted Sussman and his investigator, Robert Versis, with serving subpoenas on these witnesses. Id. at 10. On cross-examination, James said that he had been in touch with Tania and Tia Ivey by phone throughout the trial and that they had seemed willing to testify. Id. at 28–29, 33–34.

Tania James testified at the evidentiary hearing as well. Her testimony was somewhat scattered, but she stated that she did not know Black and had not sold drugs from Defendant's apartment in the time before he was arrested. Id. at 87–88. Tania also explained that she had received a subpoena to appear on July 17 and had in fact appeared in court that day. Id. at 80. Tia Ivey also testified at the hearing. Ivey said that she did not testify at James's trial, but if she had been called, she would have said that she did not know him to be in possession of drugs in 2012. Id. at 71–72. On cross-examination, Ivey admitted that she had never been to Defendant's apartment and had seen him only once in 2012. Id. at 76. Church did not testify at the remand hearing.

A longtime member of our Bar, Edward Sussman died before the evidentiary hearing in this case took place. The Court thus has not heard evidence of his recollection of what transpired at Defendant's trial.

## II.    Legal Standard

"The Sixth Amendment right to counsel in 'all criminal prosecutions' is the right to the effective assistance of counsel." United States v. Burroughs, 613 F.3d 233, 238 (D.C. Cir. 2010) (quoting Strickland v. Washington, 466 U.S. 668, 685 (1984)). A defendant is denied this right

when (1) his attorney represents him deficiently and (2) the deficiency causes him prejudice.  Id.

"To establish deficiency, [he] must show that his 'counsel's representation fell below an

objective standard of reasonableness.'"  Porter v. McCollum, 558 U.S. 30, 38 (2009) (quoting

Strickland, 466 U.S. at 688).  Applying "a 'highly deferential' standard of review," United States

v. Harris, 491 F.3d 440, 442 (D.C. Cir. 2007) (quoting Strickland, 466 U.S. at 689), the Court

must determine whether the defendant's attorney "made errors so serious that [she] was not

functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Strickland, 466

U.S. at 687.  To establish prejudice, the "defendant must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different."  Id. at 694   A "reasonable probability is a probability sufficient to undermine

confidence in the outcome."  Id.  In ruling on an ineffectiveness claim, the Court does not need

"to address both components of the inquiry if the defendant makes an insufficient showing on

one."  Id. at 697.  Accordingly, "[i]f it is easier to dispose of an ineffectiveness claim on the

ground of lack of sufficient prejudice . . ., that course should be followed."  Id.

## III.    Analysis

Defendant's claim can be summed up simply: standby counsel Edward Sussman

performed deficiently when he subpoenaed witnesses for the incorrect dates, and this deficiency

prejudiced him at trial because those witnesses would have damaged the prosecution's case.  As

the Court will explain, it is somewhat skeptical that Sussman performed deficiently given

James's control over all tactical trial decisions.  But that facet of the analysis ultimately makes

no difference because, assuming that counsel performed deficiently under the Sixth Amendment,

such deficiency did not prejudice Defendant in light of all the evidence that was presented at

trial.

A.  <u>Deficiency</u>

Both sides recognize that this is not a traditional ineffective-assistance-of-counsel case.

Since Defendant represented himself at trial, he did not rely on an attorney in the usual sense.

Instead, the Court appointed Sussman as standby counsel to "give [Defendant] advice and some

assistance in the courtroom and outside of the courtroom"; James himself was "in charge."  <u>See</u>

Tr. Status Hearing 5/2/13 at 13, 22; <u>see also</u> <u>id.</u> at 5 ("[I]f you represent yourself, only you will

be permitted to examine witnesses, make objections in court, argue motions.  All of that will fall

on you in the courtroom.").  Such delimiting of duties is consistent with the typical role of

standby counsel.  <u>See, e.g.</u>, <u>United States v. Sanders</u>, 778 F.3d 1042, 1046 (D.C. Cir. 2015).

Sussman is now alleged to have performed certain outside-the-courtroom tasks

deficiently — namely, the improper subpoenaing of witnesses.  Yet even if he did act negligently

here, the Court would likely find that such errors are not enough, on their own, to give rise to an

ineffectiveness claim.  To the extent a defendant retains some right to counsel when he proceeds

*pro se*, any deficiency attributable to his <u>own</u> duties and performance — rather than to standby

counsel's — cannot be the basis for an ineffectiveness claim.  <u>See</u> <u>Faretta</u>, 422 U.S. at 834 n.46.

That appears to be what happened in this case.  When he realized that the witnesses were not

present on the fourth day of trial, James could have declined to rest his case and instead asked

Judge Wilkins to continue the trial until the following day.  Indeed, the court that next day asked

Defendant why he did not do so, and he replied that he did not "know[] [he] could have raised an

argument and got a postponement to get them here."  Tr. Day 5 at 712.  That was Defendant's

error, which Judge Wilkins explained was "part of the danger of being [his] own lawyer."  <u>Id.</u>

Had he raised the issue, as a reasonably competent attorney might have done, and the witnesses

were able to testify, there would be no possibility of deficient performance.  <u>See</u> <u>Faretta</u>, 422

U.S. at 834 n.46; <u>see also</u> <u>United States v. Gray-Burriss</u>, 920 F.3d 61, 68 (D.C. Cir. 2019)

(holding that counsel did not perform deficiently because any failure was defendant's "fault

rather than that of his attorneys").  This question is ultimately immaterial, however, since James

has failed to make the separate showing required as to prejudice.

    B.  <u>Prejudice</u>

    As the Court has explained, to prevail on an ineffective-assistance-of-counsel claim,

Defendant must show that his attorney's deficient performance <u>prejudiced</u> him — *i.e.*, "that there

is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different."  <u>Strickland</u>, 466 U.S. at 694.  James makes two types of

prejudice arguments in this case.  First, he posits that prejudice is <u>presumed</u> because his

attorney's deficiencies prevented him from calling witnesses on his behalf.  Second, he maintains

more generally that there is a reasonable probability that the jury would have reached a different

conclusion had they heard testimony from the witnesses who had been subpoenaed for the

incorrect dates.  The Court disagrees on both scores.

    1.  *Presumed Prejudice*

    Defendant suggests that prejudice is automatic in this case because Sussman's failures

limited his "Sixth Amendment right to compel the testimony of witnesses as part of his right to

present a defense."  Def. Mem. at 6.  In effect, James argues that any neglect by counsel to

procure a witness for trial — no matter how insignificant — requires reversal of a defendant's

conviction.  This is not so.  For one thing, a defendant seeking to establish a violation of his right

to compulsory process (or his concomitant right to present his defense under the Due Process

Clause) must demonstrate prejudice; the mere inability to have a particular witness testify is not

enough.  <u>See</u> <u>United States v. Valenzuela-Bernal</u>, 458 U.S. 858, 869–72 (1982).  It would be

illogical to mandate reversal where a witness did not testify on account of counsel's errors, but not where the witness fails to testify because of a decision by the trial court.  For another, such an approach is inconsistent with the Supreme Court's admonitions about the prejudice inquiry in ineffective-assistance-of-counsel cases.  In <u>Weaver v. Massachusetts</u>, 137 S. Ct. 1899 (2017), the Court concluded that the traditional <u>Strickland</u> prejudice inquiry applied in cases where a defendant "raises a public-trial violation via an ineffective-assistance-of-counsel claim."  <u>Id.</u> at 1911.  That was so even though violations of the public-trial right are structural and thus require automatic reversal on direct review because "not every public-trial violation results in fundamental unfairness" to the defendant.  <u>Id.</u> at 1909.  Here, Defendant offers no reason why the mere possibility of harm to his right to call witnesses in his defense requires a presumption of prejudice when the actual violation of a structural right did not in <u>Weaver</u>.  For these reasons, consistent with how the D.C. Circuit and others have treated similar claims, <u>see</u> <u>United States v. Shabban</u>, 782 F.3d 3, 8–9 (D.C. Cir. 2015); <u>Fortenberry v. Haley</u>, 297 F.3d 1213, 1227–28 (11th Cir. 2002), the Court will not presume that any deficiency in procuring witnesses actually harmed James.

### 2. *Strickland* Prejudice

This conclusion neatly segues into Defendant's alternative position, which is that the missing witnesses caused him prejudice here because, if they had testified, there is a reasonable probability that the jury would have reached a different verdict.  In particular, Defendant argues that Tania James's testimony would have undermined evidence offered by the Government's rebuttal witnesses: Delonte Black and Porsha Foster.  <u>See</u> Def. Mem. at 10.  For two reasons, the Court is not persuaded that the testimony of these witnesses creates a reasonable probability of a different result.  First, the uncalled witnesses' evidence was not particularly powerful or

exculpatory. And second, taken as a whole, the evidence of Defendant's guilt presented at trial was quite strong. Each will be discussed in turn.

### a.   Uncalled Witnesses' Testimony

Consider first the substance of the testimony of the three witnesses James says should have been called. Two — Tia Ivey and Lynetta Church — appeared to have little to offer that would diminish the Government's case or help Defendant's. Based on Defendant's own submissions and the evidentiary hearing, Ivey and Church would have testified that they did not see James possess drugs in 2012. See Tr. Evid. Hearing at 12–13, 71–72; Def. Mem. at 11. Yet Church never even appeared at the hearing to explain her testimony in any detail or be cross-examined, and Ivey admitted on cross that she did not even know where Defendant lived and had only seen him one time between January and May 2012. See Tr. Evid. Hearing at 76. These witnesses' general statements — based on little recent personal interaction with Defendant — are hardly probative, let alone the sort of testimony that would cause a reasonable probability of a different result.

That leaves the third witness, Defendant's wife, Tania James. Based on her testimony at the evidentiary hearing, if called at trial, she would have testified to the following: (1) She never sold drugs from James's apartment in 2012; (2) she had never met Delonte Black; (3) she never saw Defendant sell drugs in the time before his arrest; (4) a law-enforcement depiction of the apartment was missing a closet; and (5) the missing closet had a woman's clothes in it. See Tr. Evid. Hearing 85–88. None of this evidence creates a reasonable probability of a different result. The last three pieces of proffered testimony are either of little probative value or duplicative. As with Ivey and Church, general testimony about Defendant's not having possessed or sold drugs does little to impugn the Government's case. This is particularly so where Tania is alleged to

have had little recent contact with James.  The testimony about the closet is duplicative — both James and his neighbor, Angela Pearson, testified about the closet missing from the depiction of the apartment, and James testified that his girlfriend at the time kept personal items in that closet. See Tr. Day 4 at 562, 577, 593, 616–17.  The issue also seems to have little bearing on Defendant's guilt.

Tania's testimony that she did not sell drugs out of James's apartment in 2012 and did not know Delonte Black deserves more consideration.  In its case-in-chief, the Government did not introduce evidence about who sold drugs out of the apartment prior to the execution of the search warrant.  Instead, the parties agreed to a stipulation providing that a person "purchased crack cocaine in exchange for $20 of United States currency" from a woman in Defendant's apartment. See Tr. Day 2 at 285.  The stipulation further stated that the purchaser "did not see Anthony James during the narcotics purchase and did not hear any male voice during the narcotics purchase."  Id.  In its rebuttal case, however, the prosecution called Black, a Park Police informant who conducted the aforementioned narcotics purchase.  Black testified, among other things, that he bought the cocaine from James's wife.  See Tr. Day 4 at 666.  Tania's testimony that she did not sell Black drugs and did not know him would thus have been surrebuttal evidence, used to contradict Black's telling of events.  As the Court will explain, while this testimony might have helped James's case in several ways, none of these ultimately calls into doubt the jury's verdict.

This testimony might first help Defendant by generally undermining Black's telling of events — i.e., if he was lying or mistaken about whom he bought drugs from, he might be lying or mistaken about other aspects of his testimony, including more inculpatory ones.  But any gain in this respect is minimal because the identity of the person Black bought drugs from is not a fact

that is important either to his credibility or to the overall weight of his testimony.  On credibility,
Black did not at first identify the person he bought drugs from as Defendant's wife; only
subsequently in his testimony did he say he thought the person was James's wife.  Id. at 665–66.
There also seems little obvious motive for Black to lie about this issue.  The parties have
stipulated that he bought the drugs from a woman in James's apartment, so why would it matter
who that person was?  The upshot is that the jury might well think that Black believed the person
he met was Tania James, and that he was merely mistaken about her identity.  His credibility thus
may have remained largely intact despite Tania's surrebuttal testimony.  Furthermore, to the
extent the jury felt that Black was contradicted on this particular issue, it may not have even
affected their ultimate perception of him, given that he was operating as a paid government
informant and impeached to that effect.  Id. at 672, 678–82.

Second, Tania's testimony might lead the jury to wonder whether it was James's
girlfriend, Porsha Foster, who sold Black the drugs; that conjecture, in turn, might lead the jury
to doubt Foster's testimony that James had bagged cocaine in the months before his arrest.
While this chain of inferences is admittedly one the jury might have considered, the connection
between the testimony and doubt about James's guilt is ultimately quite attenuated.  Consider
again what that chain looks like.  To start, the jury believes Tania James's testimony that she did
not sell the drugs, despite her bias in favor of Defendant and against her own culpability.  The
jury then disbelieves Black's testimony about who sold him the drugs, either because it finds him
mistaken or thinks he is lying.  The jury next infers that the unnamed woman must have been
Porsha Foster, since she had been staying over at Defendant's apartment several nights a week.
From there, the jury infers that Foster's separate testimony about James's drug possession is
concocted to divert law-enforcement's attention from her own involvement or in response to

pressure exerted on her by the prosecutor.  The jury finally <u>speculates</u> either that the drugs discovered in the house were entirely Foster's or that they belonged to some unknown person.

Understood in this context, the connection between Tania James's testimony and the key questions in the case is quite weak.  Indeed, a range of other interpretations of Tania's testimony seems more plausible.  Assuming the jury would have believed her, they might have thought that Foster sold the drugs but that she was telling the truth about James's culpability; her own involvement does not invalidate her testimony, just as co-conspirators' testimony is not false simply because they may have also been involved in the criminal conduct.  The jury might also have questioned Foster's testimony yet still maintained their belief that James was guilty, given, as discussed next, that her testimony was part of the Government's surrebuttal case and ultimately a minor part of a broad array of evidence of Defendant's guilt.

One final point is worth emphasizing about Tania's potential testimony: based on the Court's own observation during the evidentiary hearing, it doubts that the jury would have found her credible or persuasive.  As a witness, Tania has obvious biases, including her relationship with Defendant and a desire to avoid criminal culpability based on the allegation that she sold cocaine.  More important, her testimony to this Court was scattered and difficult to follow, her affect odd and off-putting, thus further minimizing any positive effect she would have had on the jury had she been called to testify.  All of this weighs heavily against any finding that, if Tania had testified, there would be a reasonable probability of a different outcome.

### b.  Evidence in the Case

This conclusion is further enhanced by the strength of the other Government evidence. In these circumstances, the minor contradiction of a rebuttal witness and general statements

about Defendant's good character do not hurdle the prejudice bar.  A brief description of such

evidence will make that clear.

The Government's case against James took three forms.  <u>First</u>, it presented the physical

evidence found at his apartment — namely, the substantial quantities of cocaine, digital scales,

bulletproof vest, and hundreds of small plastic bags.  <u>See</u> Tr. Day 3 at 345–75.  Such evidence,

moreover, was discovered in the kitchen and dining area and was not particularly hidden from

view.  <u>Id.</u> at 350, 355–59.  Because James and his son were the sole leaseholders and residents,

the natural inference was that the narcotics belonged to one or both of them.  <u>See</u> Tr. Day 2 at

263; Tr. Day 4 at 585.  <u>Second</u>, the Government introduced evidence of statements James made

on the day the search warrant was executed.  <u>Id.</u> at 263, 268–78.  There is no dispute that he told

detectives that he would take any charge and that he mentioned that there was cocaine in the

apartment in varying amounts.  Detectives also testified, moreover, that James clearly indicated

that the narcotics were his — rather than his son's — and stated that he had purchased them three

days before, and provided specific amounts and locations he could only have known if the drugs

were in fact his.  <u>Id.</u> at 268–79.  The latter points Defendant contested both on cross and in his

own testimony, insisting that he only said that he would "take the charge," not that the drugs

were his.  <u>See</u> Tr. Day 4 at 581.  At the same time, he insisted on cross-examination that the

drugs were not his son's — the only other person living full time in the apartment.  <u>Id.</u> at 603.

<u>Third</u>, the Government presented the rebuttal witnesses discussed above: Porsha Foster and

Delonte Black.  They testified that they had seen Defendant with cocaine — in Foster's case,

bagging it; and in Black's, giving it to someone in exchange for washing his car.  <u>Id.</u> at 634–35,

668.

Against this solid presentation, Defendant mounted his defense in two ways.  First, he argued that the statements to the Park Police were made merely to take pressure away from his son.  Id. at 601–03.  Second, he adduced evidence that other people had keys to his apartment — including some of his siblings — and that there are frequent break-ins in the neighborhood.  Id. at 564, 572.  Third, he asserted that he was in North Carolina in the several days before the search warrant was executed.  Id. at 566, 572.  Such evidence was presumably intended to suggest that someone else had entered his apartment (perhaps via break-in) and stored several thousand dollars' worth of drugs for distribution there without Defendant's knowledge.  This was, needless to say, an uphill battle for James, as the jury's rapid guilty verdict confirms.  What matters for purposes of the issue before the Court now is that the testimony from the three witnesses he believes should have been called was insubstantial relative to this evidence.  It does not meaningfully call into doubt the crux of the prosecution's case — viz., the amount and location of the physical evidence and James's statements.  Neither does it advance the defense's key strategies for sowing doubt in the minds of the jury.  For these reasons, the Court finds that Defendant has not shown a reasonable probability that, had his witnesses testified, the result of his trial would have been different.

## IV.   Conclusion

For these reasons, the Court finds that Defendant did not receive ineffective assistance of counsel.  A separate Order transmitting this Memorandum Opinion to the Court of Appeals shall issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  May 15, 2019